[Cite as *In re L.F.*, 2012-Ohio-302.]

STATE OF OHIO       )            IN THE COURT OF APPEALS
                  )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN   )

IN RE: L.F.                     C.A. No.     10CA09880

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    09JD25789

DECISION AND JOURNAL ENTRY

Dated: January 30, 2012

BELFANCE, Presiding Judge.

{¶1} Appellant, L.F., appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that adjudicated him a delinquent child for committing two counts of gross sexual imposition pursuant to R.C. 2907.05(A)(4). For the reasons set forth below, we reverse and remand the judgment of the trial court.

I.

{¶2} During early January 2009, Z.F., then nine years old, was playing a computer game with his father and older half-brother, when the father reminisced about when he had punished the older child for accessing pornographic websites on the family's computer. The father explained that he had been able to trace the boy's internet activity on the computer because each computer records a history of the websites it accesses. Immediately after that discussion, Z.F. told his father about an incident that he remembered from the prior summer

during which two of his cousins, eight-year-old J.F. and fifteen-year-old L.F.,[1] were viewing a pornographic website and "sucking wieners." After his father asked him if anything else had happened, Z.F. further disclosed that L.F. had him sit on his lap while L.F. had his pants off. Z.F.'s mother immediately contacted Lorain County Children Services and J.F.'s mother.

{¶3} The next day, Z.F. and J.F. were separately interviewed by a children services caseworker, with some follow-up questioning by a police detective who sat in the room during each interview. Aside from Z.F. and J.F. each stating that the three cousins went with a laptop computer to J.F.'s bedroom, where L.F. pulled up a pornographic website, the statements of Z.F. and J.F. varied sharply about anything else that happened in the room. Specifically, each child recounted entirely different versions of where L.F. touched each of them. Despite the inconsistencies in the witnesses' statements, the Lorain County Prosecutor's Office later filed a complaint, alleging that L.F. was a delinquent child because he committed acts against Z.F. and J.F. that would constitute gross sexual imposition if committed by an adult. The matter proceeded to an adjudicatory hearing.

{¶4} When Z.F. and J.F. testified at the adjudicatory hearing, they continued to contradict each other and each boy detailed the incident differently than he had before, contradicted himself as he testified, and responded to numerous questions with the answer, "I don't know." Neither witness neither explained the sequence of events in J.F.'s bedroom, nor did either testify about what L.F. said or how he behaved before, during, or after the alleged incidents. Nevertheless, the trial court found that L.F. had committed two counts of gross sexual imposition by having sexual contact with Z.F. and J.F.

---

[1] J.F. and Z.F. are first cousins; L.F. is their first cousin, once removed.

**{¶5}** Pursuant to Juv.R. 29(F)(3), L.F. requested written findings of fact and conclusions of law, which the trial judge later issued. Through its findings of fact and conclusions of law, the trial judge implicitly indicated that he did not believe the statements or testimony about L.F. "sucking [J.F.'s] wiener," but he did believe other statements and testimony of Z.F. and J.F. that L.F. took J.F.'s hand by the wrist and forced him to touch L.F.'s penis and that L.F. touched his penis to J.F.'s buttocks and Z.F.'s leg. L.F. appeals and raises two assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT VIOLATED L.F.'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION, AND JUV.R. 29(E)(4) WHEN IT ADJUDICATED L.F. DELINQUENT OF GROSS SEXUAL IMPOSITION ABSENT PROOF OF EVERY ELEMENT OF THE CHARGE AGAINST HIM BY SUFFICIENT, COMPETENT, AND CREDIBLE EVIDENCE.

**{¶6}** L.F.'s first assignment of error challenges the sufficiency of evidence supporting his delinquency adjudication. Although juvenile delinquency cases are technically civil in nature, this Court applies the same sufficiency and manifest weight standards of review in a juvenile delinquency case that it applies in an adult criminal appeal due to the "'inherently criminal aspects' of delinquency proceedings * * *." *In re Z.B.*, 9th Dist. No. 09CA0039-M, 2010-Ohio-1345, ¶ 6; *In re R.D.U.*, 9th Dist. No. 24225, 2008-Ohio-6131, ¶ 6.

**{¶7}** Although L.F.'s argument focuses primarily on contradictions between the testimony of Z.F. and J.F. and challenges their credibility as witnesses against him, this Court's sufficiency review does not allow us to assess "whether the state's evidence is to be believed," but instead requires us to determine "whether, if believed, the evidence against a defendant

would support a [delinquency adjudication]." *State v. Thompkins*, 78 Ohio St.3d 380, 390 (Cook, J., concurring). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *In re M.M.*, 6th Dist. Nos. L-10-1267, L-10-1309, and L-10-1310, 2011-Ohio-2962, ¶ 17, citing *Thompkins* at 386 (1997). This Court conducts its sufficiency review de novo. *State v. Williams*, 9th Dist. No. 24731, 2009-Ohio-6955, ¶ 18, citing *Thompkins* at 386.

{¶8} L.F. was adjudicated delinquent based on two counts of violating R.C. 2907.05(A)(4), which provides that "[n]o person shall have sexual contact with another [or] * * * cause another * * * to have sexual contact with the offender * * * when * * * [t]he other person * * * is less than thirteen years of age[.]" R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, [or] buttock * * * for the purpose of sexually arousing or gratifying either person."

{¶9} The evidence before the trial court consisted of the testimony of J.F. and Z.F and the statements that they made to others. Through their prior statements and testimony at the hearing, J.F. and Z.F. stated that L.F. had committed several acts of inappropriately touching them, including that L.F. had exposed his penis and forced J.F. to touch it with his hand, touched his penis to the outside of J.F.'s jeans on his buttocks, and touched Z.F.'s pants with his exposed penis. Also, J.F.'s testimony on cross-examination and Z.F.'s prior statements included brief allegations that L.F. had performed fellatio on J.F.

{¶10} Because the State presented evidence that L.F. had touched each boy with his exposed penis or required them to touch his penis, there was sufficient evidence that he committed the requisite touching to constitute two acts of sexual contact because he caused each

of them to touch his genitals, an erogenous zone explicitly identified in R.C. 2907.01(B). R.C. 2907.05(A)(4). The State was also required to demonstrate that L.F. committed the acts of touching "for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). This Court has held that the trier of fact must infer from the evidence whether the defendant's purpose in touching the victim was to achieve sexual arousal or gratification of either person. *In re A.L.*, 12th Dist. No. CA2005-12-520, 2006-Ohio-4329, ¶ 19, quoting *State v. Cobb*, 81 Ohio App.3d 179, 185 (9th Dist.1991). "In making its decision the trier of fact may consider the type, nature and circumstances of the contact, along with the personality of the defendant." *Cobb* at 185. *Accord In re Anderson*, 116 Ohio App.3d 441, 444 (12th Dist.1996).

{¶11} Because each child gave only a vague and brief description of what transpired inside J.F.'s bedroom that summer afternoon, the evidence before the trial court consisted almost exclusively of L.F.'s acts of inappropriate touching, as neither child elaborated about anything else that L.F. said or did before, during, or after the alleged acts. Nonetheless, the totality of the acts themselves created an inference that L.F. touched his cousins for the purpose of sexual arousal or gratification, as the evidence included testimony of J.F. and the prior statement of Z.F. that L.F. performed fellatio on J.F.

{¶12} The act of fellatio is more serious than an act of "sexual contact," as it falls within the definition of "[s]exual conduct" under R.C. 2907.01(A) and the crime of rape under R.C. 2907.02. Because acts of sexual conduct are explicitly sexual in nature, "the definitions of sexual conduct in R.C. 2907.01(A) necessarily imply that the actor's motive is sexual gratification, and so no further proof of sexual gratification is required when sexual conduct is proved." *State v. Gillingham*, 2nd Dist. No. 20671, 2006-Ohio-5758, ¶ 31. *Accord In re Amos*, 3rd Dist. No. 3-04-07, 2004-Ohio-7037, ¶ 10 (a purpose of sexual arousal or gratification could

be inferred for purposes of satisfying the definition of "sexual contact" because the conduct satisfied the more serious act of "sexual conduct"); *State ex rel. Montgomery v. Pakrats Motorcycle Club, Inc.*, 118 Ohio App.3d 458, 464 (9th Dist.1997) (emphasizing that the very nature of sexual conduct implies sexual arousal and gratification).

{¶13} The victims' statements about L.F. performing fellatio on J.F. created an inference that he committed that act for the purpose of his own sexual arousal or gratification. As there was also evidence that the sequence of events included the additional acts of L.F. requiring J.F. and Z.F. to touch his penis, it can be inferred from the totality of the evidence that L.F. committed those acts for the same purpose. Consequently, L.F.'s adjudication of delinquency for committing two counts of gross sexual imposition was supported by sufficient evidence. The first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT VIOLATED L.F.'S RIGHT TO DUE PROCESS WHEN IT ADJUDICATED HIM DELINQUENT OF GROSS SEXUAL IMPOSITION WHEN THOSE FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶14} L.F.'s second assignment of error is that his adjudication was against the manifest weight of the evidence. In reviewing a challenge to the manifest weight of the evidence, this Court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (1986). When reversing a judgment on the basis that it was against the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." Thompkins, 78 Ohio

St.3d at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶15} In *State v. Mattison*, 23 Ohio App.3d 10 (8th Dist.1985), the court noted several factors to be considered when determining whether a conviction is against the manifest weight of the evidence. Those factors include whether the evidence was uncontradicted, whether a witness was impeached, what was *not* proved, that the reviewing court is not required to accept the incredible as true, the certainty of the evidence, the reliability of the evidence, and whether the evidence is vague, uncertain, conflicting, or fragmentary. *Accord State v. Apanovitch*, 33 Ohio St.3d 19, 23-24 (1987) (citing the factors with apparent approval).

{¶16} L.F. was adjudicated delinquent for committing two counts of gross sexual imposition under R.C. 2907.05(A)(4), one against Z.F. and one against J.F., each of whom was under the age of thirteen at the time of the alleged offenses. L.F. does not dispute that the evidence established that each of the alleged victims was under the age of thirteen during the summer of 2008. To prove each violation of R.C. 2907.05(A)(4), the State was also required to prove that L.F. had sexual contact with the alleged victim, or required the child to have sexual contact with him. R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another * * * for the purpose of sexually arousing or gratifying either person."

{¶17} L.F. argues that the trial court's adjudication was against the manifest weight of the evidence because of the sharp contradictions between the statements and testimony of each alleged victim, the fact that each child gave incomplete information and even contradicted himself while testifying, and that their allegations were unreliable due to the circumstances under which Z.F.'s initial disclosure arose and the improper techniques that were used by the

caseworker and police detective to interview each child. Essentially, L.F. argues that there were so many problems with the statements and testimony of the alleged victims that the trial court, as trier of fact, created a manifest miscarriage of justice by finding that L.F. had committed gross sexual imposition against each alleged victim. We agree.

## CONTRADICTIONS AND INCONSISTENCIES

{¶18} The State attempted to prove that L.F. committed one act of gross sexual imposition against each child, Z.F. and J.F. The evidence of the alleged acts committed by L.F. came solely from the statements and testimony of the two alleged victims. Their testimony and statements were far from "uncontradicted," however. In fact, there was no consistency between the recollections of the two witnesses as to what L.F. did to either of them. The contradictions and inconsistencies in the witnesses' statements and testimony are most apparent by addressing the two counts separately.

### Count (1) Gross Sexual Imposition of Z.F.

{¶19} Although both Z.F. and J.F. were in the room with L.F. at the same time, the only evidence that L.F. committed an offense of gross sexual imposition against Z.F. came through the statements and testimony of Z.F., who repeatedly contradicted himself.

<u>Z.F.'s statements and testimony</u>

{¶20} The evidence began with Z.F.'s initial disclosure to his parents, which was presented through the testimony of his father. Z.F.'s father testified that, on January 5, 2009, he was playing a computer game with Z.F. and his older half-brother, D., when the father began reminiscing about when D. had been punished for visiting a pornographic website on the family computer. Because D. was the only one who used the family computer at that time and the father

was able to check the computer's internet history to determine what websites had been visited, the father confronted D., who admitted that he had viewed pornography.

{¶21}  Almost immediately after that conversation, while his father had stepped out of the room, Z.F. apparently became upset and made a disclosure to his mother, who became so concerned that she called the father back into the room.  Z.F. then disclosed to his father that L.F. had been "sucking wieners" with J.F.  After his father continued to question him, Z.F. further disclosed that L.F. "made me sit on his lap and [L.F.] didn't have any pants on."

{¶22}  The next day, when Z.F. was interviewed by the caseworker and police detective, he made the following statements about L.F. touching him.  When the three cousins went into J.F.'s bedroom, J.F. told L.F. to turn on the pornography, and J.F. and L.F. watched the pornography, but Z.F. did not.  Z.F. said that he thought that they were going into J.F.'s bedroom to play video games.  While the pornography was playing on the laptop computer, L.F. asked Z.F. to sit on his lap.  When Z.F. got on L.F.'s lap, he saw that L.F.'s "wiener was there," so he jumped off.  Although Z.F. had stated earlier that he and L.F. both had all of their clothes on, the caseworker did not ask Z.F. what he meant by L.F.'s wiener being "there."  Instead, she immediately concluded that L.F. must have had his penis "out" and redirected the remainder of her questioning accordingly.  Z.F. gave no further details about what L.F. did to him and did not state that L.F.'s penis touched him.

{¶23}  At the adjudicatory hearing, Z.F. testified that he went to the other side of J.F.'s bedroom when L.F. turned on the pornography because he did not want to watch it.  After L.F. tried to touch J.F. with his "wiener" outside his clothing, L.F. called Z.F. over to sit on his lap and Z.F. complied, even though he had just observed what happened to J.F.  Although Z.F. claimed to have just seen L.F.'s "wiener" outside his clothing, he testified that when he got on

L.F.'s lap, he was surprised to see that L.F's "wiener" was outside his clothing, so he jumped off. Z.F. testified that L.F.'s "wiener" touched his pants, but he could not recall where on his pants it touched him. When asked to explain where he sat on L.F.'s lap or to describe L.F.'s "wiener," Z.F. was unable to do so.

### J.F.'s statements and testimony

**{¶24}** J.F., on the other hand, consistently maintained that L.F. never touched Z.F. When J.F. was interviewed by the caseworker, he did not mention anything about L.F. touching Z.F., even though he was asked repeatedly about what had happened in the room. Similarly, at the adjudicatory hearing, J.F. testified that he and Z.F. were in his bedroom with L.F. at the same time, but that he did not see L.F. do anything to Z.F. J.F. testified that Z.F. was lying or jumping on J.F.'s bed on the other side of the room the entire time that the three cousins were in the room.

### Count (2) Gross Sexual Imposition of J.F.

**{¶25}** The evidence that L.F. committed the offense of gross sexual imposition against J.F. consisted of the statements and testimony of both Z.F. and J.F., but each witness sharply disputed the other about where L.F. touched J.F. Moreover, their recollections of the incident changed each time they were questioned.

### Z.F.'s statements and testimony

**{¶26}** The evidence about L.F. touching J.F. again began with Z.F.'s initial disclosure to his father and was presented through the testimony of Z.F.'s father. Z.F. told his father that, while in J.F.'s bedroom watching pornography, L.F. and J.F. had been "sucking wieners." When asked what else Z.F. disclosed to him about the crime against J.F., Z.F.'s father testified, without any further details, "everything that happened to [J.F.]"

**{¶27}** At the beginning of Z.F.'s interview the day after the initial disclosure, the caseworker asked him if he knew that she was interviewing him because someone said that something happened to J.F. Z.F. meekly responded that L.F. was "sucking [J.F.'s] wiener." During the remainder of his interview, however. Z.F. did not mention that act again. Instead, when directly asked to tell what L.F. was doing in the room, Z.F. stated that L.F. tried to put his "wiener" up J.F.'s "butt," that J.F. said, "no" and "it stings." Z.F. gave no further details about L.F. touching J.F. and stated that all three boys had their pants on.

**{¶28}** At the adjudicatory hearing, Z.F. did not refer to an act of fellatio. Instead, he testified that he went over to the other side of the room after L.F. pulled up the pornographic website. Z.F. testified that he did not watch the pornography or what L.F. and J.F. were doing, but that he "saw a little bit." Z.F. testified that, from the other side of the room, he saw L.F. "put his wiener up [J.F.'s] butt." Z.F. initially testified that L.F. and J.F. were on the chair, but later stated that they were both standing up near the chair when the offense occurred. Z.F.'s testimony went back and forth between whether L.F. had his pants on, off, or pulled down when he tried to touch J.F. with his penis.

J.F.'s statements and testimony

**{¶29}** On the other hand, J.F., the one who was closer to L.F. and allegedly touched by him, consistently maintained that, although L.F. had "tried" to touch his penis to J.F.'s buttocks, L.F. never actually made contact. Instead, the act of touching alleged by J.F. was that L.F. took J.F.'s hand by the wrist and forced him to touch L.F.'s penis.

**{¶30}** During J.F.'s initial interview, when the caseworker asked him to tell what happened at his house, J.F. said that L.F. took his hand and made him touch L.F.'s "nasty thing," which J.F. indicated on an anatomical drawing was L.F.'s penis. J.F. further told her that L.F.

tried to put his face "down there" and that L.F. tried to touch J.F.'s backside with his "nasty thing." J.F. later stated that L.F. had his pants off and shirt on and that J.F.'s own clothes remained on the entire time. J.F. insisted that nothing else happened to him.

{¶31} At the adjudicatory hearing, J.F. testified that L.F. was sitting in a chair when he pulled up the pornographic website. When L.F. called J.F. over to the chair, L.F. stood up and left the laptop computer resting on the armrest of the chair. L.F. then tried to pull J.F.'s pants down, but did not, tried to make J.F. suck his "pee-pee," and took J.F.'s hand by the wrist and forced him to touch L.F.'s "pee-pee." Although J.F. later testified that L.F. tried to touch J.F.'s buttocks with his "pee-pee," J.F. consistently testified that L.F.'s penis never actually touched his buttocks.

{¶32} Although J.F. did not mention an act of fellatio during his direct testimony, on cross-examination, defense counsel asked him whether L.F. had "sucked his wiener" and J.F. responded, "Uh (pause) yeah." Nonetheless, J.F. repeatedly testified that his own clothes remained on the entire time.

{¶33} Defense counsel also showed a video recording of the furnishings in J.F.'s bedroom, which depicted the chair in the bedroom with wooden armrests that were only a few inches wide. Counsel attempted to demonstrate the unlikelihood that L.F. could have balanced the laptop computer on the armrest of that chair while he got up, pulled down his pants, tried to pull down J.F.'s pants, forced J.F. to touch him, and tried to touch his "pee-pee" to J.F.'s buttocks.

## VAGUENESS OF THE EVIDENCE

{¶34} In addition to the sharp discrepancies between the recollections of Z.F. and J.F. as to how, if at all, L.F. touched each of them, neither child was able to remember anything about

the circumstances surrounding the alleged touching. Aside from explaining that the three boys came into J.F.'s bedroom and L.F. pulled up pornography on the laptop computer, their description of the events lacked any detail about how long the pornography was playing, how L.F. or any of them reacted to it, how long any of them was in the room, or anything that L.F. said to them or they said to him or each other before, during, or after the alleged incidents.

## CIRCUMSTANCES SURROUNDING THEIR DISCLOSURES

{¶35} The reliability of each child's allegations was further called into question by the circumstances surrounding their initial disclosures. Z.F.'s initial disclosure arose immediately after his father told him about punishing his older half-brother for viewing pornography and explained to him that one cannot conceal a visit to a pornographic website because each computer stores a history of the internet sites it accesses. When Z.F. and J.F. were initially questioned, each insisted that he had not watched the pornography when L.F. pulled up the website, but Z.F. stated that J.F. had watched it and he thought that J.F. had done so before. J.F. also initially testified that he did not watch the pornography, but, when cross-examined with Z.F.'s prior statement, admitted that he had. Z.F.'s father testified that Z.F. spent a lot of unsupervised time on the computer and that he would be upset if he learned that Z.F. had looked at a pornographic website.

{¶36} There was also evidence that Z.F.'s older half-brother, D., had been the victim of a sexual molestation by an adult male approximately six years earlier. Although Z.F. denied ever talking to his half-brother about the incident, defense counsel presented evidence that there were details about the molester posted on the public MySpace page of Z.F.'s father. Although Z.F.'s father denied posting anything on the MySpace page, he conceded that it was posted there for

public viewing because L.F.'s attorney had been able to access it and some of the father's own friends had seen the page and commented about it.

{¶37} Defense counsel also called an expert witness to challenge the reliability of the statements Z.F. and J.F. made during their interviews by the caseworker and police detective. A forensic psychologist testified about the proper techniques to use when interviewing children about allegations of sexual abuse. He emphasized that, because a report about child sexual abuse typically comes from the child himself, it is critical that the interviewer be trained to question the alleged victim using an accepted protocol, to avoid contaminating the veracity of the child's disclosures. He emphasized that, before questioning the child about the alleged incident, the interviewer must first determine the intelligence and developmental level of the child, his prior relationship with the alleged perpetrator, his prior exposure to sexual material, and what prior disclosures he has made about the alleged incident. As the interview focuses on the alleged incident, the interviewer must avoid using leading questions, being too quick to refer to anatomical drawings or dolls, or otherwise inserting new information into the interview. For example, he explained that the interviewer should not paraphrase what the child said by using different words, because changing the child's words increases the risk that new, false information will be inserted into the interview.

{¶38} After reviewing the video recordings of the interviews of Z.F. and J.F., the expert noted several examples of how the caseworker did not follow the proper interview protocol, which may have compromised the veracity of each child's initial statement. To begin with, the caseworker did no preliminary questioning of either child to determine his intelligence or developmental level, his prior exposure to sexual material, his prior relationship with L.F., or his prior discussions with others about the alleged incidents.

**{¶39}** Moreover, the defense expert explained how the caseworker failed to follow proper protocol while questioning each child about the alleged incidents. For example, while questioning Z.F., after he stated that he jumped off L.F.'s lap when he saw that L.F.'s "wiener was there," the caseworker immediately substituted the word "out" for "there" during the remainder of the questioning. The expert explained that the caseworker changed the meaning of Z.F.'s actual statement and inserted new, potentially false, information into the interview. The expert pointed to further examples of the caseworker compromising the veracity of each child's statement by paraphrasing their answers or jumping to conclusions about the meaning of what they said, by using leading questions, and by using other questions that were too vague to elicit accurate information from children their age.

**{¶40}** The forensic expert further testified that, during the interview of J.F., the caseworker introduced anatomical drawings "way too earl[y]" which "can have a major suggestive effect on children." The expert also testified that the caseworker approached each interview with a "confirmative bias[,]" explaining that her questioning sought simply to elicit the disclosures of abuse that she was expecting to hear from each child, rather than searching for the truth by exploring alternative explanations of what may have happened to each child. He emphasized that there were significant inconsistencies between the statements of the two boys, who were supposed to have been in the same room at the time of the alleged incidents, which should have prompted the interviewer to more carefully question the veracity of their statements.

**{¶41}** The caseworker conceded on cross-examination that she had received minimal training in techniques for interviewing children about suspected sexual abuse. She testified that she had received some training, but could not recall much about it, whether it was one or more days, or whether it covered many of the basics of the interview protocol that the forensic expert

had discussed. The caseworker admitted that she may have introduced new information into Z.F.'s interview by substituting the word "out" for his statement that L.F.'s wiener was "there." She explained that she substituted the word based on her assumption that Z.F. meant that L.F.'s penis was outside his clothing, even though Z.F. had not told her that L.F.'s penis was exposed.

{¶42} The caseworker also admitted that, although she had received information that Z.F.'s older half-sibling had been the victim of a sexual assault, she did not explore that fact with Z.F., nor did it influence her questioning of him. The caseworker also conceded that there were many, significant inconsistencies between the statements of Z.F. and J.F.

**CONCLUSION**

{¶43} Due to many inconsistencies and contradictions in the eyewitness testimony, the vagueness of the witnesses' recollections, and the questionable reliability of their initial disclosures due to the manner in which they were questioned and the circumstances surrounding their disclosures, the adjudication of delinquency based on L.F. committing two counts of gross sexual imposition was against the manifest weight of the evidence. L.F.'s second assignment of error is sustained.

III.

{¶44} L.F.'s first assignment of error is overruled because his delinquency adjudication was supported by sufficient evidence. Because the adjudication was against the manifest weight of the evidence, however, L.F.'s second assignment of error is sustained. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is reversed and remanded for a new adjudicatory hearing.

Judgment reversed and
cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
DICKINSON, J.
CONCUR


APPEARANCES:

ROBERT CABRERA, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and STEPHEN LIST, Assistant Prosecuting Attorney, for Appellee.