[Cite as *In re G.B.*, 2011-Ohio-5152.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**Nos. 95521, 96169, and 96279**

# IN RE: G.B.
# A Minor Child

# JUDGMENT:
# REVERSED AND REMANDED

Criminal Appeals from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL 10106206

**BEFORE:**   Jones, J., Stewart, P.J., and Cooney, J.

**RELEASED AND JOURNALIZED:**   October 6, 2011

**ATTORNEYS FOR APPELLANT**

Timothy Young
State Public Defender

BY: Sheryl A. Trzaska
Assistant State Public Defender
Office of the Ohio Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY: Amey Tucker
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, J.:

{¶ 1} Defendant-appellant, "G.B.," [1] appeals his juvenile delinquency adjudication for aggravated robbery. For the reasons that follow, we reverse.

---

[1] We identify the appellant by his initials in keeping with this court's established policy to protect the identities of juvenile appellants.

**{¶ 2}** In 2010, G.B. was charged in Cuyahoga County Juvenile Court with one count of aggravated robbery with one- and three-year firearm specifications. The matter proceeded to a bench trial, at which the following evidence was presented.

<u>State's Evidence</u>

**{¶ 3}** James Jackson ("Jackson") testified that on April 9, 2010, he left his house on Silsby Avenue in Cleveland Heights "after 10 p.m." to walk to the CVS drugstore on the corner of Cedar and Lee Roads to purchase cigarettes. Jackson, who was 62 years old at the time of the incident, testified it took him longer than might be expected to walk to the store because he walks with a cane; he estimated that it took him 20-25 minutes. Jackson testified that he was near the drugstore when he was approached by two "young men." According to Jackson, one juvenile wore a brown coat with "fur" trim around the collar and a fur-lined hat with ear flaps. The other juvenile had light skin and wore a white t-shirt and black "hoodie." Jackson testified that the area outside the drugstore was well-lit and he got a good look at the juveniles and their clothing. They were standing about "two steps" from him when one of the young men asked Jackson, "old school, you got any money?" Jackson replied that he did not, and the two young men turned to talk to each other. Jackson testified that instead of proceeding inside the store, he turned and started walking home. He explained that he tried to walk home as quickly as he could with his cane, but the young men followed him, watching him from the other side of the street and keeping a slow pace with him. Jackson testified that he looked around for police or anyone who could help him, but did not see anyone. He turned onto

Silsby when, two to three houses before his home, the young men approached him a second time.   One of the juveniles, later identified by Jackson as G.B., said "old school, do you have any money?"   The young man then ripped Jackson's necklace off his neck.

{¶ 4}   Jackson testified that when the young man "snatched" his necklace off his neck, Jackson was looking right at him.   After the juvenile took Jackson's necklace, the other young man opened his sweatshirt and showed Jackson his gun, which was sticking out of his waistband.   Jackson described the gun as a nickel-plated revolver.   The young man demanded Jackson's rings and told him, "I should have popped you, old school," which Jackson took to mean that the juvenile was saying he should have shot him.

{¶ 5}   Jackson testified he was scared he would be shot, so he gave the young men his two rings, including his wedding ring.   The young men fled, running back towards Lee Road.   According to Jackson, the entire incident lasted about two minutes. Jackson yelled for his wife, who called the police on her cell phone.

{¶ 6}   When the police arrived, Jackson described the juvenile who took his necklace as having "fur on his coat and his hat * * * he had like wool, but it was on the collar and inside, you know, the label.   You know, the inside * * * lining or whatever you call it."   The police informed Jackson that they had someone in custody and took Jackson and his wife to identify the suspect.

{¶ 7}   Jackson told police that the juvenile they had in custody, G.B., was the assailant who took his necklace.   He testified he recognized G.B.'s face, hat, and coat.

After identifying G.B., the police took Jackson to look at ten to 12 more suspects they had detained in the area, but Jackson did not identify any of them as one of his assailants.[2]

{¶ 8} In court, Jackson identified G.B.'s hat and coat as the same his assailant wore and identified G.B. as the youth who had taken his necklace. Jackson admitted he takes multiple prescription pain medications every day, but argued he had not consumed any pills in the few hours before the robbery.

{¶ 9} On cross-examination, Jackson conceded he had not told police about the first encounter he had with the two juveniles outside CVS.

{¶ 10} Officer Matthew Cinader of the Cleveland Heights Police Department testified he responded to the scene of the robbery. Officer Cinader had received a description from dispatch that one of the assailants was wearing "a brown coat with fur around it, some blue jeans." Officer Cinader could not remember if dispatch's description of the suspect included a fur hat with ear flaps, but testified Jackson told him one of the assailants was wearing a fur hat. When Jackson arrived to where the suspect was detained, he stated "that's him right there."

{¶ 11} Lieutenant Sudyk testified that the call of a robbery in progress came in at 11:47 p.m. One suspect was said to be wearing a brown jacket with fur around the collar and jeans. Lt. Sudyk testified that three to five minutes after he received the information, he saw a young man matching the description of one of the assailants

---

[2] No additional information was ever obtained about the second assailant.

walking westbound on the south side of Cedar Road, towards Lee Road. When the officer approached the young man, the juvenile cooperated and was handcuffed and patted down. The lieutenant searched G.B. for weapons and looked for the stolen jewelry, but found only a cell phone and charger.

{¶ 12} The lieutenant explained to G.B. that a robbery had occurred in the area and G.B. matched the description of "a black male wearing a brown jacket with a fur collar and jeans." G.B. told the lieutenant he had been at his girlfriend's house and was on his way to the bus stop to catch a bus home to Maple Heights. Lt. Sudyk apprehended G.B. about 100 feet from the bus stop, which was about a half-mile from where the robbery had occurred.

Defense's Evidence

{¶ 13} R.L., G.B.'s girlfriend, testified that G.B. arrived at her house between 7:00 p.m. and 7:30 p.m. He helped her parents carry their groceries inside. According to R.L., G.B. stayed at her house until 11:45 that evening watching a Cleveland Cavaliers basketball game and then left to catch the 12:01 a.m. bus back home. She explained she remembered the time her boyfriend left because she looked at the clock on the cable box.

{¶ 14} R.L.'s grandmother, Betty Cowans, testified that G.B. was still at the house at 11:35 p.m. when she went downstairs to get a glass of water. She was certain of the time because she looked at her cable box while watching television.

**{¶ 15}** R.L.'s father, Marvin Leek, testified that at 11:31 p.m., he told his daughter it was time for G.B. to leave. R.L.'s mother, Tonya Cowans, testified that G.B. was at her house that evening to watch a basketball game with her daughter. She testified that she woke up her husband up at 11:30 p.m. and told him to tell G.B. to leave because she (Tonya) was getting tired and wanted to go to bed. She explained that the rule in the house was that boys had to leave before she went to bed. She called out to her daughter around 11:45 p.m. to see if G.B. had left yet, and R.L. replied "he's at the door now. He's leaving now." Cowans testified she was sure that G.B. was at her house the entire evening.

**{¶ 16}** R.L.'s cousin, testified he lives in the basement of R.L.'s house and went upstairs to talk with G.B. and R.L. throughout the game, and G.B. was at the house the entire evening. He testified that G.B. left the house around 11:45 p.m.

**{¶ 17}** G.B. testified he was in the 11th grade at Maple Heights High School and had never been suspended from school, convicted of a crime, owned or carried a gun. He testified he frequently visited his girlfriend in Cleveland Heights and usually took the bus to get there. On April 9, 2010, he took the bus to R.L.'s house; the bus dropped him off around 6:40 p.m. He walked to her house and arrived at the same time as her parents. He helped her parents carry the groceries inside.

**{¶ 18}** G.B. testified that he sat on the couch and watched the basketball game with R.L. He left her house at exactly 11:43 p.m., after her father told him to leave. He walked down her street, Goodnor, and turned right on Cedar. As he was walking past

Pizza Hut, a police officer pulled into the parking lot, pulled out his gun, and ordered him to the ground. G.B. complied, was handcuffed, and checked for weapons. He testified he told the officer he did not commit the robbery and did not know who did.

{¶ 19} The trial court adjudicated G.B. delinquent of the single count in the complaint with firearm specifications and sentenced him to two years at the Ohio Department of Youth Services.

{¶ 20} G.B. now appeals, raising three assignments of error for our review:

"I. The trial court erred when it denied [G.B.'s] motion to dismiss the complaint when the evidence presented to the trial court supported a finding of innocence, not an adjudication for aggravated robbery with a gun specification.

"II. [G.B.] was denied his right to due process and a fair trial when the trial court permitted pretrial identification testimony that was the product of unduly suggestive show-up made under highly suggestive conditions.

"III. [G.B.] was denied his right to the effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution when counsel failed to move the court to suppress [sic] [G.B.'s] pretrial identification and did not request the court to appoint an eyewitness-identification expert to assist in [G.B.'s] defense."[3]

<u>Manifest Weight of the Evidence</u>

---

[3] G.B. filed two successive appeals, Cuyahoga App. Nos. 96169 and 96279, which he stated had to do with trial court decisions denying his request to correct the record in the case. We consolidated all three appeals, but G.B. states that the issues surrounding the lower court record have been resolved; therefore, he is only raising issues that relate to the underlying adjudication.

**{¶ 21}** In the first assigned error, G.B. argues that the trial court erred in adjudicating him delinquent.

**{¶ 22}** The same standard of review for manifest weight challenges applies to juvenile and adult criminal matters. *In re G.R.*, Cuyahoga App. No. 90391, 2008-Ohio-3982. In determining whether a conviction is against the manifest weight of the evidence, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009. A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. Therefore, this court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 485 N.E.2d 717, paragraph three of the syllabus.

**{¶ 23}** To support his contention that the trial court erred in adjudicating him delinquent, G.B. points out that he has no prior juvenile record and supporters wrote

letters to the court on his behalf; five alibi witnesses testified he was at the Leek's house during the time the robbery occurred; R.L. lived in the area of the robbery, which explained why G.B. was in the area of the drugstore; he maintained his innocence; and the identification was tainted by a cross-racial identification and the fact that the victim was elderly and scared.

{¶ 24} G.B. testified that he was at R.L.'s house watching a basketball game from 7 or 7:30 p.m. until 11:45 p.m. G.B. left to catch the 12:01 a.m. bus to return to his house in Maple Heights. R.L., her parents, cousin, and grandmother all substantiated G.B.'s testimony, testifying that G.B. was with R.L. the entire evening and left the house around 11:45 p.m.

{¶ 25} Although Jackson testified he got a "good look" at his assailants, it was not until trial that he mentioned that his assailants first approached him outside CVS and followed him home. In the statement Jackson gave to police, the initial contact he claimed to have had with his assailants was on Silsby near his house, not near the CVS. Moreover, it was dark outside and Jackson admitted being very afraid. Jackson further testified that the only lights where the robbery occurred were one streetlight a couple houses away and one across the street.

{¶ 26} Jackson testified that he looked into his assailant's eyes when the juvenile took his necklace, but the encounter was brief and Jackson was unable to describe anything other than the assailant's coat and hat to police.

{¶ 27} We also take into account that G.B. was arrested blocks from the crime scene, on Cedar Road, near and walking towards the bus stop. If we are to believe the state's version of events, if G.B. had been running towards Lee Road after the robbery then it would have been unlikely that G.B. could have run or walked from Silsby Road to Lee Road, north on Lee Road to Cedar Road, down Cedar Road, and then turned around so as to be walking in the opposite direction within the three- to five-minute time frame between when the call of the robbery came in and when the lieutenant detained G.B. We further note that G.B. complied with police commands and immediately told police he had been at his girlfriend's house, and the police did not recover any of the stolen property or a weapon from him. Moreover, the description Jackson gave to police did not match G.B. as the coat G.B. was wearing was lined with fleece, not with fur.

{¶ 28} Based on the specific facts of this case, we find that this is the rare case where the evidence weighs heavily against G.B.'s adjudication of delinquency; therefore, the trial court's adjudication of delinquency was against the manifest weight of the evidence.

{¶ 29} The first assignment of error is sustained. Because the first assignment of error is dispositive of this case, we need not reach the second and third assignments of error. See App.R. 12(A)(2).

{¶ 30} Accordingly, judgment is reversed and the case is remanded for a new trial.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

LARRY A. JONES, JUDGE

MELODY J. STEWART, P.J., and
COLLEEN CONWAY COONEY, J., CONCUR