[Cite as *In re D.C.*, 2015-Ohio-4367.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102165**

# IN RE: D.C.
# A Minor Child

## JUDGMENT:
### AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL 14101161

**BEFORE:** Celebrezze, A.J., Boyle, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** October 22, 2015

**ATTORNEYS FOR APPELLANT**

Timothy Young
Ohio Public Defender
BY:    Charlyn Bohland
Assistant Public Defender
250 East Broad Street
Suite 1400
Columbus, Ohio 43215


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    Jeffrey S. Schnatter
Assistant Prosecuting Attorney
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., A.J.:

{¶1} Defendant-appellant, D.C. ("appellant"), brings this appeal challenging the juvenile court's finding of delinquency on one count of rape. Specifically, appellant argues that the juvenile court's finding of delinquency is against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶2} The juvenile court trial of appellant and D.B. involved the sexual assaults of A.B., a 15-year-old female, and M.A., a 17-year-old female, that occurred on March 3, 2013. At the time of the incident, appellant was 16 years old and D.B. was 17 years old.

{¶3} On the evening in question, appellant, D.B., and three other friends were socializing at D.V.'s house. D.B. left the house around 5:00 p.m. to meet his girlfriend, A.B., and her cousin, M.A., at a bus station and bring them back to the house. The events that transpired at the house were disputed at trial, and there was conflicting testimony as to whether A.B. and M.A. consented to the sexual acts that took place.

{¶4} A complaint was filed in juvenile court on January 16, 2014, alleging that appellant and D.B. were delinquent children for committing the following offenses:

Count 1: Kidnapping, R.C. 2905.01(A)(4), of A.B.

Count 2: Kidnapping, R.C. 2905.01(A)(4), of M.A.

Count 3: Rape (oral), R.C. 2907.02(A)(2), of M.A.

Count 4: Rape (vaginal), R.C. 2907.02(A)(2), of A.B.

Count 5: Rape (oral), R.C. 2907.02(A)(2), of A.B.

Count 6: Rape (digital), R.C. 2907.02(A)(2), of A.B.

### Appellant's Testimony

{¶5} Appellant's version of the events is as follows. Within minutes of arriving at the house, M.A. — at A.B.'s suggestion — showed the males explicit photos of herself and lifted her shirt to show the piercings on her breasts. Appellant heard M.A. and one of his other friends, "Cush," discuss having sex for money. There is conflicting testimony as to whether money was exchanged after the sexual encounter. After hearing M.A. initially decline, appellant observed M.A. and Cush go into the bathroom together. Appellant also observed A.B. and D.B. walk into the back bedroom. A.B. performed oral sex on appellant in the stairwell to the outside door.

{¶6} Appellant and the other males proceeded to follow A.B. and M.A. to the bus stop and called the females offensive and derogatory names. Furthermore, appellant overheard an argument between M.A. and Cush about money, and stated that all of the males refused to give M.A. any money.

Appellant contends that both females willingly had sex with multiple people at D.V.'s house.

### M.A.'s Testimony

{¶7} M.A.'s version of the events is as follows. A.B. made the suggestion that

M.A. show the males her piercings, and the discussion about having sex for money took place while everyone was sitting in the living room. M.A. showed Cush the piercings on her breasts and had consensual sex with him in the bathroom. M.A. left the bathroom after she heard A.B. screaming, and was then forced into the room with A.B., where the males jeered the females and urged them to remove their clothing. M.A. was forced to perform oral sex on one of the males, but she could not positively identify or recognize the males that were present in the room as these events transpired. Furthermore, M.A. only agreed to have sex with Cush. M.A. believed the females were at the house for 45 minutes to an hour. M.A. thought she was going to get $20, marijuana, or cocaine in exchange for having sex with one of the males. M.A. was angry that she did not receive the money or drugs. M.A. observed A.B. bleeding from her vagina and crying after the incident.

### A.B.'s Testimony

{¶8} A.B.'s version of the events is as follows. A.B. did not expect to do anything at appellant's house other than to meet his mother. M.A. voluntarily showed the males explicit photos of herself and then showed the males the piercings on her breasts. Furthermore, A.B. observed M.A. go into the bathroom with six males, and did not hear anyone discussing sex for money. A.B. and D.B. were having a conversation in the bedroom until appellant entered the room. D.C., D.B., and the other males proceeded to hold A.B. down and have sex with her, and they brought M.A. into the room and assaulted her as well.

{¶9} A.B. screamed for help and attempted to fight the males off for approximately 30 minutes. A woman then knocked on the bedroom door, at which point everyone put on their clothes and left the house. D.B. was able to identify the other males who were present in the bedroom when the males implored the females to take off their clothes. A.B. did not learn about the money until after everyone left the house, and she believed M.A. was upset because the males had not given her any money for sex. A.B. experienced bleeding and severe pain in her lower stomach and vagina. A.B. did not consent to having sex with anyone.

## State's Other Evidence

{¶10} The state also offered the testimony of sexual assault nurse examiner Alison Rerko, who examined A.B., and Katherine Goellnitz, who examined M.A. The nurses conducted the examinations the day after the incident at D.V.'s house. Nurse Rerko noticed evidence of scratching on the outer layers of A.B.'s vagina, and believed that the scratches were consistent with digital penetration. Nurse Goellnitz noticed a bruise on M.A.'s forearm — consistent with her testimony that the males pulled her forearm to force her into the bedroom — and bruising on her inner thigh. Nurse Goellnitz also observed a tear — or "scant speck" — in M.A.'s vagina, consistent with digital penetration. Both nurses collected swabs from the females for DNA testing. Appellant was excluded as a contributor from the samples taken from M.A. and A.B. D.B. could not be excluded as a contributor from the samples taken from A.B.'s vaginal swab, shorts, and cheek, and could

not be excluded as a contributor from the sample taken from M.A.'s underwear.

**Verdict and Sentence**

**{¶11}** At the close of trial, the juvenile court found D.B. to be delinquent of rape (vaginal) — both of A.B. and M.A. Furthermore, the juvenile court adjudicated appellant delinquent of rape, as to Count 3, and not delinquent of counts 1, 2, 4, 5, and 6. The juvenile court committed appellant to the Ohio Department of Youth Services for a minimum period of one year, maximum to his twenty-first birthday. Appellant filed the instant appeal, assigning one error for review:

> The juvenile court violated D.C.'s right to due process when it adjudicated him delinquent of rape, when the evidence demonstrated that the incident was consensual, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution; and, Article I, Section 16, Ohio Constitution.

**II. Law and Analysis**

**{¶12}** In his sole assignment of error, appellant argues that the juvenile court's finding of delinquency must be overturned because it was against the manifest weight of the evidence.

**{¶13}** In determining whether a juvenile court's adjudication of delinquency is against the manifest weight of the evidence, the applicable standard of review is the same standard applied in adult criminal convictions. *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 34; *see In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 28. A challenge to the manifest weight of the evidence questions whether the state has met its burden of persuasion. *State v. Byrd*, 8th

Dist. Cuyahoga No. 98037, 2012-Ohio-5728, ¶ 27. When considering a claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of conflicting testimony." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The weight-of-the-evidence standard "addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.

{¶14} This court reviews the entire record, weighs the evidence and all reasonable inferences, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *see also State v. Jackson*, 8th Dist. Cuyahoga No. 86542, 2006-Ohio-1938, ¶ 29. In conducting such a review, this court remains mindful that the credibility of the witnesses are primarily for the trier of fact to assess. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to make credibility determinations, as this court cannot view the demeanor of a witness while testifying. Therefore, the trier of fact is in the best position to determine if the proffered testimony is credible. *State v. Holloway*, 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015, ¶ 42, citing *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103,

2013-Ohio-2999, ¶ 26.

{¶15} A conviction is not against the manifest weight of the evidence simply because conflicting evidence was presented at trial and the jury rejected the defendant's version of the facts and believed the testimony presented by the state. *State v. Gibson*, 8th Dist. Cuyahoga No. 101826, 2015-Ohio-2390, ¶ 38, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28. Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶16} Appellant contends that the juvenile court's rape adjudication is against the manifest weight of the evidence because the evidence was contradictory, inconsistent, and illogical. Furthermore, appellant argues that the "competent and credible evidence demonstrated that the oral sex between [appellant] and M.A. was consensual." We find that appellant's adjudication of delinquency was not against the manifest weight of the evidence.

{¶17} Appellant contends that the rape adjudication is against the manifest weight of the evidence because of the major inconsistences between the stories of A.B. and M.A. Specifically, appellant bases his argument on the following inconsistencies in the females' stories: (1) M.A.'s breast piercings, (2) a discussion about having sex for money, (3) the events occurring in the bathroom, (4) the events occurring in the bedroom, (5) timing, and (6) the involvement of D.V.'s mother.

{¶18} First, appellant argues that the females' stories regarding M.A.'s piercings

are inconsistent. A.B. testified that M.A. showed the males her breast piercings voluntarily. M.A., however, testified that it was A.B. who suggested showing the males the breast piercings. Appellant's testimony corroborated M.A.'s version of the events.

{¶19} Second, appellant argues that the females' stories regarding the discussion of having sex for money are inconsistent. A.B. testified that she did not hear M.A. discuss having sex for money at the house, and that she had learned about the discussion after the females left the house. M.A., however, testified that she discussed having sex for money with Cush in the living room, where A.B. was present. Appellant's testimony corroborated M.A.'s version of the events.

{¶20} Third, appellant argues that the females' stories regarding the events that took place in the bathroom are inconsistent. A.B. testified that she observed M.A. walking into the bathroom with six males. M.A., however, testified that she only went into the bathroom with Cush.

{¶21} Fourth, appellant argues that the females' stories regarding the events that took place in the bedroom are inconsistent. A.B. initially reported being pushed into, and locked inside, the bedroom by the males. However, at trial, A.B. testified that she willingly went into the bedroom with her boyfriend, D.B.

{¶22} Fifth, appellant argues that there are timing inconsistencies in the females' stories. M.A. testified that she believed the females spent 45 minutes to an hour at the house. Appellant disputes this account, arguing that the fact that the females' two-hour bus passes expired before returning to the bus stop, suggests that they spent more than two

hours at the house.

{¶23} Sixth, appellant argues that there are inconsistencies in the females' stories regarding D.V.'s mother. Appellant testified that D.V.'s mother was in her bedroom — located just off of the living room — while the events transpired. A.B. testified that after 30 minutes of screaming for help in the bedroom, D.V.'s mother knocked on the door and inquired as to what was going on inside. Furthermore, A.B. testified that the mother left after one of the males in the bedroom told her that nothing was going on. M.A. testified that she left the bathroom after hearing A.B.'s screams. Appellant disputes the females' stories, arguing that if A.B. had actually been screaming, it is unlikely that the mother would leave — merely because one of the males said nothing was going on — without further inquiry. Instead, appellant maintains, it is more likely that the mother heard suspicious noises — not screaming — coming from the bedroom.

{¶24} These inconsistencies, however, do not cast serious doubt on appellant's role in the sexual assault. The important aspects of A.B. and M.A.'s testimony remained largely consistent over time. At trial, both A.B. and M.A. testified that they were forced — against their will — to have sex in the bedroom, until being interrupted by D.V.'s mother. Admittedly, details concerning how A.B. got into the bedroom changed. However, the crux of A.B.'s account of what transpired inside the bedroom did not. A.B. stated that once inside the bedroom, D.C., D.B., and the other males proceeded to hold her down and have sex with her. A.B. did not consent to having sex with any of the males. Furthermore, M.A. only consented to having sex with one of the males, Cush. M.A.

testified that after having consensual sex with Cush in the bathroom, she was pulled into a room and forced to perform oral sex on one of the males.

{¶25} After considering the accounts of the witnesses, weighing the credibility of the accounts, and evaluating the evidence, the juvenile court found that the females had been forced to have sex. Furthermore, the court found that the females' injuries indicated that force had been used. A.B. experienced bleeding and severe pain in her lower stomach and vagina. M.A. confirmed these physical symptoms, testifying that she observed A.B. bleeding from her vagina and crying. The testimony of the nurses who treated the females also described actions consistent with the trauma of being raped.

{¶26} Sexual assault nurse examiner Alison Rerko examined A.B. and sexual assault nurse examiner Katherine Goellnitz examined M.A. Nurse Rerko noticed evidence of scratching on the outer layers of A.B.'s vagina, and believed that the scratches were consistent with digital penetration. Furthermore, Nurse Rerko prescribed HIV and STD medications to A.B. M.A. told Nurse Goellnitz that she only consented to having sex with Cush. Nurse Goellnitz noticed a bruise on M.A.'s forearm — consistent with her testimony that the males pulled her forearm to force her into the bedroom — and bruising on her inner thigh. Nurse Goellnitz also observed a tear — or "scant speck" — in M.A.'s vagina, consistent with digital penetration. Both nurses collected swabs from the females for DNA testing. Appellant was excluded as a contributor from the samples taken from M.A. and A.B. D.B. could not be excluded as a contributor from the samples taken from A.B.'s vaginal swab, shorts, and cheek, and could not be excluded as a

contributor from the sample taken from M.A.'s underwear.

{¶27} Although appellant was excluded as a contributor from the DNA samples taken from both victims, the juvenile court found him to be delinquent for the rape of M.A. under the complicity statute, R.C. 2923.03, stating:

> Under 2923.03, if you are procuring, if you are aiding and abetting, if you are helping, if you are holding down somebody while someone else is doing something, you become responsible for everyone else's actions.
>
> There was testimony that the guys were saying, do it, oh yeah, like that. That is a gang rape and everybody becomes responsible for everyone else's actions.

Based on accomplice liability, the juvenile court found appellant "to be delinquent of having oral intercourse with [M.A.] by purposely compelling her to submit by force or threat of force."

{¶28} The inconsistent testimony referenced by appellant goes to the credibility of A.B. and M.A., and to the weight of the evidence. The juvenile court was in the best position to make these credibility determinations, and the finding of delinquency is not against the manifest weight of the evidence simply because conflicting evidence was presented and the court rejected appellant's version of the facts and believed the testimony presented by A.B. and M.A. *See State v. Gibson*, 8th Dist. Cuyahoga No. 101826, 2015-Ohio-2390, ¶ 38; *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28. This court "must give great deference to the factfinder's determination of the witnesses' credibility." *In re R.J.*, 8th Dist. Cuyahoga No. 98034, 2012-Ohio-4821, ¶ 22; *see State v. Chandler*, 10th Dist. Franklin No. 05AP-415, 2006 Ohio 2070, ¶ 9. The

juvenile court found that the victims had "credible, consistent stories over time."

{¶29} Finally, appellant contends that the rape adjudication is against the manifest weight of the evidence because credible and competent evidence demonstrates that the oral sex with M.A. was consensual. Specifically, appellant argues that although the oral sex was consensual, M.A. changed her story — in order to get back at him and the other males — when they refused to pay her. The juvenile court was in the best position to weigh the credibility of the witnesses, and the record demonstrates that the court considered the credibility of the accounts and all the evidence in adjudicating appellant delinquent. The juvenile court found this theory to be the defense's strongest argument. However, after considering the credibility of the accounts and all the evidence—particularly M.A.'s testimony — the court found that she was raped.

{¶30} We cannot say that the juvenile court "lost its way" simply because it found A.B. and M.A. to be more credible than appellant. Furthermore, we cannot say that this was an exceptional case where — despite the juvenile court's resolution of the conflicts in the witnesses' testimony — the evidence weighed heavily against the conviction. Appellant's rape adjudication is not against the manifest weight of the evidence.

{¶31} Appellant's assignment of error is overruled.

### III. Conclusion

{¶32} After reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we cannot find that the juvenile court clearly lost its way. The juvenile court was in the best position to weigh

the credibility of witnesses, and the record demonstrates that the juvenile court thoroughly considered both the credibility of the accounts and all the evidence in finding appellant delinquent of rape. The important aspects of A.B. and M.A.'s testimony remained largely consistent over time, and this testimony was corroborated — both by the females' injuries and the testimony of the nurses who treated them after the incident. Thus, appellant's rape adjudication is not against the manifest weight of the evidence.

{¶33} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution. The finding of delinquency having been affirmed, any bail or stay of execution pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., ADMINISTRATIVE JUDGE

MARY J. BOYLE, J., and
PATRICIA ANN BLACKMON, J., CONCUR