[Cite as *In re G.H.*, 2015-Ohio-5339.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| G.H., DELINQUENT CHILD | | |
| | : | |
| | : | **CASE NO. 2015-L-037** |

Appeal from the Lake County Court of Common Pleas, Juvenile Division, Case No. 2014 DL 02269.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Alana A. Rezaee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Appellee).

*James W. Reardon*, Carrabine & Reardon Co., L.P.A., 7445 Center Street, Mentor, OH 44060 (For Defendant-Appellant, G.H.).

THOMAS R. WRIGHT, J.

{¶1} Appellant, G.H., challenges the trial court's finding of true on six counts of rape, one count of kidnapping, one count of assault, and one count of public indecency based upon sufficiency and manifest weight of the evidence. For the reasons to follow, the judgment is affirmed.

{¶2} In the fall of 2014, appellant, seventeen years old, attended a local high

school in Lake County, Ohio. Shortly before the beginning of the school year, he befriended E.C., fifteen years old, also a student at the same school. During the first few months of the school year, once or twice a week, appellant would pick up E.C. at her home and give her rides to school. Typically, appellant and E.C. would communicate via text the night before about riding together the next day.

{¶3} Appellant and E.C. typically arrived at school about forty minutes before their first class and would talk with friends, including E.C.'s boyfriend. Appellant and E.C. did not have classes together, but they would eat lunch together with other students.

{¶4} In early December 2014, E.C. and her boyfriend ended their relationship. Over the next four school days, appellant drove E.C. to school. On the first day, appellant went directly to the school, and they immediately went inside. On the second day, however, December 10, appellant drove past the school and pulled into an empty parking lot of a local park, and parked his vehicle in an area behind a nearby gas station.

{¶5} After initially talking and listening to the radio, appellant leaned over to kiss E.C. Following this initial contact, appellant and E.C. engaged in six separate sexual acts over the next twenty minutes, the first three in the front seat, and the final three in the back seat. The conduct ceased when a small commuter bus parked near appellant's vehicle. After getting dressed and returning to the front seat, appellant immediately drove to the high school.

{¶6} According to E.C., none of the encounter was consensual. She testified that she objected to appellant's advances when he first tried to kiss her, stating that she

2

was not ready for a new relationship. She further testified that she told appellant "no" multiple times and continuously asked him to stop until she finally gave up near the end of the encounter. E.C. physically tried to resist appellant, but he used forced to subdue her including: twice forcing her head down upon his genitals; grabbing her shoulders and shoving her back against the rear passenger door; holding her wrists as he engaged in intercourse with her for the first time; and choking her while engaging in intercourse a second time.

{¶7} Appellant did not deny that he engaged in six separate sex acts with E.C. that morning. He also did not deny that he choked her while having intercourse with her the second time. However, according to him, their encounter was consensual. Appellant testified that he asked her at the beginning whether she wanted to have sex, and she consented so long as no one else was told. He further testified that he choked her during intercourse because he thought she liked it.

{¶8} In the two days following the incident, E.C. continued to have contact with appellant. She continued to communicate with him through text messages, continued to ride with him to school, and continued to sit near him at lunch. Their text messages contained references to their encounter, and how it had ended abruptly when the commuter bus arrived. As to why E.C. continued to interact with appellant, she testified that she was frightened that appellant would become physically abusive if she stopped communicating with him.

{¶9} At some point after lunch on Friday, December 12, E.C. told her former boyfriend what happened. When E.C. stated that she did not consent, he told her that she needed to tell someone. That evening, E.C. informed her mother and stepfather.

3

The local police department was contacted. Following the initial police interview at E.C.'s home, she was taken to the hospital and a rape kit test was performed.

{¶10} A few days later, E.C. went to the police department and gave a recorded statement. The police then asked E.C. to contact appellant on her cell phone and to engage him in conversation about the incident. When appellant did not answer the call, E.C. sent him text messages. Initially, E.C. asked him why he had forcefully tried to kiss her when she told him to stop. He replied that he was sorry and knew he was a bad person. E.C. then sent him a series of texts in which she asked appellant to elaborate upon why he had continued to be aggressive despite her resistance. In addition to repeating that he was sorry, appellant stated that he regretted the incident and that he would understand if she did not want to be friends. When E.C. further referred to specific acts, appellant again apologized.

{¶11} That same day, appellant was arrested at his parents' home. The arresting officer asked him whether he knew why he was being arrested. Appellant responded, "yes."

{¶12} In addition to the six rape counts, appellant was also charged with seven counts of gross sexual imposition. At the conclusion of a one-day bench trial, the trial court found all seven gross sexual imposition charges not to be true, but found the six rape counts, the single count of kidnapping, the single count of assault, and the single count of public indecency to be true.

{¶13} After referring the case to a magistrate for a sentencing recommendation, the trial court rendered judgment. As to the rape and kidnapping charges, the court ordered appellant to be committed to the Ohio Department of Youth Services for a

4

minimum period of one year, but suspended commitment and placed him on community control. As part of the community control conditions, the trial court ordered him to serve a ninety-day term in juvenile detention. A ninety-day term was also imposed but suspended on the assault and public indecency charges.

{¶14} On appeal, appellant asserts two assignments of error for review:

{¶15} "[1.] Juvenile-Appellant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution where trial counsel failed to raise Juvenile Rule 29 Insufficiency of the Evidence.

{¶16} "[2.] The trial court erred to the prejudice of the juvenile-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

{¶17} The assignments will be discussed together.

{¶18} In claiming that he was denied effective assistance of trial counsel, appellant argues that a motion to dismiss all charges should have been asserted at the close of the state's case because the evidence was insufficient to warrant a finding of true on any of the charges.

{¶19} Appellant also contends that the finding of true as to nine of the sixteen charges is against the manifest weight of the evidence.

{¶20} When both manifest weight and sufficiency challenges are raised, an appellate court's rejection of the manifest weight argument necessarily means there was sufficient evidence. *State v. DiBiase*, 11th Dist. Lake No. 2011-L-124, 2012-Ohio-6125, ¶38. As will be discussed below, the evidence establishes that the trial court's ruling is not against the manifest weight and, necessarily then, the sufficiency

5

assignment is meritless.

{¶21} Appellant's "manifest weight" challenge to the rape and kidnapping charges focus upon the "force" element.

{¶22} "In determining whether a juvenile court's adjudication of delinquency is against the manifest weight of the evidence, the applicable standard of review is the same standard applied in adult criminal convictions." *In re: D.C.*, 8th Dist. Cuyahoga No. 102165, 2015-Ohio-4367, ¶13. As a general proposition, a "weight of the evidence challenge indicates that a greater amount of the credible evidence supports one side of the issue than supports the other. *In re: G.B.*, 8th Dist. Cuyahoga Nos. 95521, 96169, and 96279, 2011-Ohio-5152, ¶22.

{¶23} "[A] manifest weight challenge requires the reviewing court to play the role of a 'thirteenth juror.' *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997). A reviewing court should be cognizant of the fact that the [trier of fact] is in the best position to assess the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus (1967). For an appellate court to overturn a conviction as being against the manifest weight of the evidence, it must be found that "'the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1983)." *State v. Lynch*, 11th Dist. Ashtabula No. 2013-A-0039, 2014-Ohio-1775, ¶21.

6

{¶24} In contending that E.C.'s version should be rejected as unbelievable, appellant claims her post-incident conduct is inconsistent with her claimed lack of consent and his use of force. In support, he notes that there is no dispute that when the commuter bus arrived, E.C. did not try to run away or cry for help; she continued to ride with him in the mornings and eat lunch with him over the next two days; in response to a text from appellant, she did not foreclose having future sexual relations with appellant; and she did not claim she was raped until discussing it with her former boyfriend two days later.

{¶25} While in isolation, the foregoing arguably undermines E.C.'s credibility. E.C. explained that she delayed telling anyone about the rape and conducted herself as she did because she feared appellant would again become physically abusive. Given E.C.'s testimony that she did not consent, coupled with appellant's use of force, her post-incident conduct does not warrant a conclusion that the trial court clearly lost its way.

{¶26} Moreover, when appellant's version of a consensual encounter is viewed in conjunction with his texts after the fact, his credibility was undermined. Although appellant did not admit that he forced E.C. to engage in the sexual conduct, he apologized to her multiple times, stated more than once that he was a "bad" person, and that he would understand if E.C. no longer wanted to be his friend.

{¶27} Appellant further submits that E.C.'s testimony should have been rejected because the state did not present corroborating evidence. A rape victim's testimony, however, requires no corroboration. *State v. Bush*, 11th Dist. Portage No. 2005-P-0004, 2006-Ohio-4038, ¶21.

**{¶28}** Finally, appellant argues the public indecency count must be reversed because there was no evidence that his genitals were exposed to the public. Pursuant to R.C. 2907.09(A)(1), a person can be convicted of public indecency when he recklessly exposes his private parts "under circumstances in which the person's conduct is likely to be viewed by and affront others * * *." As part of her testimony, E.C. testified he was completely nude below the waist while they were in the back seat of his vehicle. Given these facts, and the other testimony, the state's evidence is sufficient to establish the requisite exposure to E.C.

**{¶29}** Viewed as a whole, the trial court fulfilled its fact-finding role in determining E.C's testimony to be more credible than appellant's. Moreover, the evidence was sufficient to satisfy all elements of the nine charges found to be true. Appellant's assignments are without merit and the judgment is affirmed.

TIMOTHY P. CANNON, P.J., concurs,

DIANE V. GRENDELL, J., concurs in judgment only with a Concurring Opinion.

_____

DIANE V. GRENDELL, J., concurs in judgment only with a Concurring Opinion.

**{¶30}** I concur in the judgment to affirm the lower court's finding of "true" on the counts against G.H. I write separately, however, given the need to more fully consider the credibility of both G.H. and E.C. Specifically, an accurate analysis of this case requires a thorough discussion of the role of the fact-finder in determining the credibility

8

of witnesses and how it applies to the facts and testimony presented in this case.

{¶31} Pursuant to a review of the record, various questions arise relating to E.C.'s testimony and credibility. E.C., after the occurrence of the rape, continued to request rides to school from G.H., as well as sit at the same lunch table with him. She also initially told friends that she "had sex" with G.H. rather than explaining that she had been raped. Such testimony is characterized by G.H. as evidence that E.C. "change[d] her story" about having consensual sex when she had "feelings of guilt and remorse." It cannot be said that this is an unreasonable argument in light of the totality of the testimony.

{¶32} With these concerns relating to E.C.'s testimony, however, the role of the appellate court on credibility issues must be made abundantly clear. "When assessing witness credibility, the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact * * * and [the appellate court] cannot substitute [its] judgment" for that of the trier of fact. *State v. Jaskiewicz*, 11th Dist. Trumbull No. 2012-T-0051, 2013-Ohio-4552, ¶ 22. While this principle is often repeated in appellate court decisions, it is of particular importance to the present case. The justification for this proposition is critical: "the trier of fact is in a much better position to observe the body language, demeanor, and voice inflections of the witnesses." (Citation omitted.) *State v. Tvaroch*, 11th Dist. Trumbull No. 2012-T-0008, 2012-Ohio-5836, ¶ 46.

{¶33} In this case, where both E.C.'s and G.H.'s versions of the events raised areas of concern, the fact-finder's role in determining credibility was intertwined with the ultimate outcome. The ability of the trier of fact to observe these two witnesses, including their emotional responses, tone of voice, and other matters related to their

9

demeanor which were not discernible to this court from a reading of the written transcript, must be given great weight. While the choices made by E.C. after the rape may give rise to questions about their reasonableness, the truthfulness of her version of events was for the lower court judge to decide. If found to be credible, as E.C. clearly must have been, her testimony provided all that was necessary to support the findings of true.

{¶34} Given these considerations, G.H. fails to raise any arguments that would warrant usurping the finder of fact's role and determination in this case.

{¶35} For the foregoing reasons, I concur in judgment only.