[Cite as *In re H.H.*, 2023-Ohio-1292.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE H.H.                                     :

A Minor Child                                  :

Nos. 111907 and 111908

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 20, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. DL21105253 and DL22101280

---

### *Appearances:*

Timothy Young, Ohio Public Defender, and Lauren Hammersmith, Assistant State Public Defender, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Halie Turigliatti, Assistant Prosecuting Attorney.

MICHELLE J. SHEEHAN, J.:

{¶ 1} Appellant H.H. appeals from a judgment of the juvenile court adjudicating him as delinquent for his involvement in a shooting incident. On appeal, he argues the finding of delinquency is not supported by sufficient evidence

and is also against the manifest weight of the evidence. After a careful review of the record and applicable law, we affirm the judgment of the juvenile court.[1]

**Substantive and Procedural Background**

{¶ 2} The state alleged that H.H., age 12 at the time of the offenses, acted in concert with two other youths in an armed robbery. He arranged to meet with the victim Michael Hidvegi to buy marijuana from him. Rather than arriving alone, H.H. arrived in a stolen vehicle with two older youths who were masked and armed. The two older youths ended up shooting Hidvegi in an attempt to rob him.

{¶ 3} The state charged H.H. with multiple offenses for his involvement in the incident: attempted murder, discharge of a firearm on or near a prohibited premises, aggravated robbery, robbery, felonious assault, receiving stolen property, attempted grand theft, and improper handling of firearms in a motor vehicle. The juvenile court found H.H. not delinquent regarding the offenses of improper handling of firearms in a motor vehicle and attempted grand theft. The court, however, found him to have acted in concert with the other two youths and therefore found him delinquent regarding the remaining offenses based on a theory of complicity.

{¶ 4} After the adjudication of delinquency, the juvenile court ordered H.H. to serve a minimum term of five years at the Department of Youth Services ("DYS") but suspended the commitment on the condition of his acceptance to a community

---

[1] This appeal is a consolidated appeal of 8th Dist. Cuyahoga Nos. 111907 and 111908. The appellant's brief, however, does not raise any assignments of error regarding Appeal No. 111908. Accordingly, this opinion concerns only Appeal No. 111907.

corrections facility ("CCF") program. A month after the dispositional hearing, however, the juvenile court was informed that H.H. had not been accepted to the CCF program and it therefore imposed the DYS commitment.

**Trial Testimony**

{¶ 5} The state alleged that H.H. set up the robbery and worked with two other unidentified individuals in concert to rob Hidvegi. It presented the testimony of the victim, Hidvegi; several detectives and a police officer; the resident whose front yard the youths ran into after the shooting; and the owner of the stolen vehicle in which the three youths arrived. The defense claimed H.H. was unaware that the other two individuals intended to shoot Hidvegi and presented the testimony of H.H.'s sister in support of the claim.

{¶ 6} Hidvegi, age 36, testified for the state reluctantly. He failed to appear at the initially scheduled trial, and the court issued a warrant to secure his presence at the rescheduled trial. At the beginning of his testimony, he was uncooperative and claimed he lost all memory about the incident. As a result, the court permitted the state to examine him as a hostile witness. The transcript reflects, however, that he became less recalcitrant subsequently and provided extensive testimony regarding the incident.

{¶ 7} Hidvegi testified that he exchanged text messages with someone named "T" to provide marijuana to him. To his surprise, H.H., whom he knew, appeared instead. H.H. jumped in his Jeep and sat on the passenger seat but did not close the door. He asked H.H. where "T" was, and H.H. said "T" was not here, so he asked

H.H.to leave. While he was talking to H.H., two other youths, who were nearby and had masks on their faces, suddenly ran up to his vehicle. When H.H. exited his vehicle, Hidvegi turned and saw the other two at the driver's side of his vehicle. They yelled, "[D]ie mother f***er" and started shooting into the vehicle. Hidvegi fired his own gun and ran for his life. Hidvegi testified that he was unsure if H.H. had a firearm with him but he was acting like he had one by reaching in his waistband while still inside his vehicle. Hidvegi was shot in the testicles but did not know who shot him. His Jeep was badly damaged in the shooting. He testified that his whole life was "messed up" by the incident.

{¶ 8} P. May is a resident on West 97th Street, Cleveland. Her house is on the east side of the street and on the passenger side of Hidvegi's Jeep, which was parked in front of her neighbor's house. She has a surveillance camera on her house, which captured the incident, and she witnessed the event immediately after the shooting. From inside her house, she saw three youths running into her yard and hiding behind her porch, side-by-side and all hunched. One of them was leaning on her porch and shooting. She immediately called 911.

{¶ 9} On cross-examination, she acknowledged that in her 911 call, she stated that she observed three kids and two of them were hiding behind her porch. She identified defendant's Exhibit O, a still photograph from her home surveillance video, as depicting three youths running into her yard. On redirect examination, she testified she was very certain she saw all three youths running into her yard.

{¶ 10} Officer Jason Santana testified that he responded to the report of a shooting on West 97th Street. When he arrived, Hidvegi's Jeep was still running. There were shell casings on the ground near the Jeep. He learned from the neighbors that a Jeep pulled up and three males approached it. One male got into the passenger's side, and soon a shooting occurred. The driver bailed out of his vehicle and shot at the three youths, who were on the east side of the street. The Jeep's driver fled northbound on West 97th Street. The youths went inside the Jeep, and then they all fled as well. The driver was found on another street in the vicinity. He was lying on the ground bleeding. The neighbors also identified H.H., who lived in the area, as one of the three youths involved in the incident. Officer Santana learned, additionally, that the three youths arrived in a blue Hyundai Elantra, which was parked on a nearby street.

{¶ 11} On cross-examination, Officer Santana testified that when he interviewed Hidvegi at the hospital, Hidvegi told him that he was meeting "T" that day but that law enforcement believed "T" was H.H. According to Hidvegi, H.H., dressed in a white hoodie, did not have a firearm and did not make any threats, and the only individuals shooting were the two youths approaching his vehicle on the driver's side. Santana's report indicated that the approximate time of the incident was listed as between 1:20 p.m. and 1:30 p.m.

{¶ 12} B. Piskach testified she was carjacked on May 28, 2021, at gun point in her driveway. The vehicle stolen was a blue 2017 Hyundai Elantra.

{¶ 13} Detective Christopher Horvath also arrived at the scene to investigate the shooting. When he arrived, Officer Santana related to him that H.H. had been identified as one of the youths involved. Detective Horvath's testimony was accompanied by the video from May's surveillance camera. He testified that the video showed a Jeep parked in the street and three individuals approached the vehicle. One of them entered the vehicle, and when the driver exited the vehicle, "all three of them are running southbound on West 97th Street." Later, two of them went back to the Jeep, entered it, and then fled again southbound on West 97th Street. Detective Horvath testified that the video clearly showed that two youths had guns in their hands, but it was unclear if the third male — the one in the light-colored hoodie — had a gun. Detective Horvath testified that the shooting occurred at approximately 1:30 p.m.

{¶ 14} Detective Horvath also interviewed Hidvegi at the hospital. Hidvegi initially told him that while he was driving on West 97th Street northbound, a ball rolled in front of his vehicle and, when he stopped, he was approached by three youths who tried to rob him of his vehicle. Hidvegi changed his account, however, when told the incident was captured in a video and stated that he was meeting with an individual known as "T" to give him marijuana. Subsequently, Hidvegi identified H.H. from a photo array as the youth who got inside his vehicle. Furthermore, Hidvegi's cell phone record showed that Hidvegi communicated with H.H. within ten minutes of the shooting incident.

{¶ 15} Detective Michael Hale testified that he photographed the crime scene and collected the shell casings around the Jeep. Detective Darryl Johnson testified that he photographed the damaged Jeep and the photographs showed that the rear door on the driver's side and the interior door panel on the front passenger side were struck by bullets.

{¶ 16} The defense presented one witness, H.H.'s sister, age 16. She testified that Hidvegi had sold marijuana to her and H.H. on several prior occasions. Because H.H. was not old enough to have an account, she would pay Hidvegi through the app "Cash App" for the drugs. On the day of the incident, H.H. communicated with her by an Instagram video call and asked her to send Hidvegi money for marijuana. While she was on the video call with him, she heard gunshots in the background and H.H. started to run. The Instagram video call started at 1:22 p.m. and ended at 1:23 p.m.

{¶ 17} In closing argument, defense counsel argued that when the gunshots erupted, H.H. was still inside the vehicle, which reflected that he was at risk of being shot and therefore disproved H.H.'s complicity in the shooting. The defense also argued that it would be highly unlikely for H.H. to call his sister on a video call immediately before a robbery in which he was involved. The defense claimed that H.H.'s sister's testimony showed that H.H. was unaware of the impending robbery attempt.

{¶ 18} When announcing the guilty verdict, the juvenile court commented extensively regarding his review of the evidence. The court noted that the

surveillance video corroborated the testimony of Hidvegi and May. The video showed that the stolen Hyundai Elantra arrived at the scene and the three youths were walking together towards the area where Hidvegi's Jeep was parked. All three walked to the driver's side of the vehicle. After they walked around the vehicle, the youth in the white hoodie returned to the passenger side, then opened the door and got in. The court observed that he sat on the passenger seat in a way to allow him to extract himself from the vehicle quickly. Soon the youth in the white hoodie was out of the vehicle and running, and the other two were running as well, all in the same direction. The court noted that Hidvegi testified that, as soon as the one in the white hoodie exited his vehicle, the shooting started.

{¶ 19} The juvenile court found the state did not prove beyond a reasonable doubt that H.H. was in possession of a firearm at the time or that he committed the offense of grand theft. The court found, however, that he was complicit in the remaining offenses based on his past relationship with Hidvegi for drug transactions, arriving with the other two youths together, and then running together away from the vehicle after the shooting.

{¶ 20} On appeal, H.H. raises the following assignment of error:

The Cuyahoga County Juvenile Court violated H.H.'s right to due process of law, because his adjudications for attempted murder, discharge of a firearm on or near a prohibited premises, aggravated robbery, and gun specifications were not supported by credible evidence, in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution, and Article I, Section 16 of the Ohio Constitution.

Under the assignment of error, H.H. argues that the trial court's adjudications of delinquency were not supported by sufficient evidence and were against the manifest of weight of the evidence.

{¶ 21} "A juvenile court may adjudicate a juvenile to be a delinquent child when the evidence demonstrates, beyond a reasonable doubt, that the child committed an act that would constitute a crime if committed by an adult." *In re C.A.*, 8th Dist. Cuyahoga No. 102675, 2015-Ohio-4768, ¶ 47, citing R.C. 2151.35(A) and Juv.R. 29(E)(4). "This court evaluates challenges to the sufficiency and manifest weight of the evidence in delinquency adjudications under the same standards of review that apply to criminal convictions." *In re Q.W.*, 2017-Ohio-8311, 99 N.E.3d 944, ¶ 7 (8th Dist.) *See also In re L.F.*, 9th Dist. Lorain No. 10CA09880, 2012-Ohio-302, ¶ 6 (although juvenile delinquency cases are technically civil in nature, an appellate court applies the same sufficiency and manifest weight standards of review in a juvenile delinquency case that it applies in an adult criminal appeal due to the inherently criminal aspects of delinquency proceedings).

**Sufficiency of Evidence**

{¶ 22} When considering a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 23} The trial court found H.H. delinquent under a theory of complicity by acting in concert with two other individuals who fired shots at the victim in a robbery attempt. Pursuant to the complicity statute, R.C. 2923.03(A)(2), "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). To prove complicity to a crime by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

{¶ 24} "In Ohio, an offender's complicity to commit a crime may be inferred from the circumstances surrounding the crime, and that may include the offender's presence, companionship, and conduct before and after the crime is committed." *State v. Crosby*, 8th Dist. Cuyahoga No. 106504, 2018-Ohio-3793, ¶ 12, citing *State v. Moore*, 7th Dist. Mahoning No. 02 CA 152, 2004-Ohio-2320, ¶ 31, citing *Johnson* at 245. Furthermore, it is well established that circumstantial and direct evidence possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. "'Circumstantial evidence is not only sufficient, but

may also be more certain, satisfying, and persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 25} Our review of the evidence in this case indicates that the state presented sufficient evidence, albeit circumstantial, to establish that H.H. acted in complicity with two other individuals in committing the multiples offenses related to the shooting. The state produced evidence showing that H.H. arranged a drug transaction with Hidvegi but, instead of arriving alone, he arrived with two other youths, who were both masked and armed. The three of them approached the victim's vehicle together. H.H. got inside the vehicle but sat on the passenger seat with one leg hanging outside the vehicle — as if "he was about to jump out the car," in the victim's words. As soon as H.H. exited the vehicle, the other two youths shot into the vehicle at the victim, injuring him in the testicles. The three youths then ran away together in the same direction toward the front yard of a nearby house.

{¶ 26} Having reviewed the trial transcript, we conclude that, viewing the evidence presented at trial in a light most favorable to the prosecution, any rational trier of fact could have found that H.H. acted in complicity with the two unidentified youths in the multiple offenses relating to the shooting incident.

**Manifest Weight**

{¶ 27} While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Id.* Unlike a claim that the

evidence is insufficient to support a conviction, which raises a question of law, manifest-weight challenges raise factual issues. When a defendant argues his or her conviction is against the manifest weight of the evidence, the court,

> "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). As a general proposition, a "weight of the evidence challenge indicates that a greater amount of the credible evidence supports one side of the issue than supports the other." *In re: G.B.*, 8th Dist. Cuyahoga Nos. 95521, 96169, and 96279, 2011-Ohio-5152, ¶ 22.

{¶ 28} H.H. argues that Hidvegi was not a credible witness because he changed his account in his interview with law enforcement and claimed at trial that he did not recall anything about the incident. Our review of the transcript indicates that, while Hidvegi was initially reluctant to testify, he subsequently became less recalcitrant and more cooperative, providing testimony with sufficient details under both direct examination and cross-examination. Determinations regarding the credibility of witnesses and the weight given to the evidence are primarily matters for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶ 29} While H.H. does not dispute that he arranged the drug transaction with the victim and that he arrived together with the other two youths at the

arranged meeting place, he argues that the weight of the evidence does not reflect his complicity in the multiple offenses related to the shooting. He claims that he would not have put himself inside the vehicle in the line of fire if he was aware of the impending criminal activity.

{¶ 30} Contrary to H.H.'s claim, the victim was emphatic that the shooting started only after H.H. was out of his vehicle. He testified that "[H.H.] got out my car. Then the two little kids come running up with guns"; "they didn't pull their guns until [H.H.] got out the car"; and "[o]nce he got out the car, that's when they pulled their guns, not while he was in the car." The juvenile court, in reviewing the evidence, also emphasized that H.H. sat on the passenger seat in a manner that would allow him to easily extract himself from the vehicle.

{¶ 31} H.H. also argues that his sister's testimony supports his claim that he was not acting in complicity with the other two individuals: she testified that while she was on an Instagram video call with him, she heard the gunshots in the background. H.H. argues this evidence showed he was not aware of the impending robbery because he would not have communicated with her by a video call that could capture the shooting.

{¶ 32} The state challenges the credibility of H.H.'s sister's testimony, pointing to the evidence showing that the one-minute Instagram video call began at 1:22 p.m. while the timestamp on the video showed that the shooting occurred

around 1:32 p.m., ten minutes after the video call.[2]  In addition, H.H.'s sister's testimony that she was communicating with H.H. immediately prior to the shooting was at odds with the state's evidence establishing that H.H. was inside the victim's vehicle conversing with the victim immediately before his quick exit from the vehicle and the eruption of gunshots.  It is well settled that the trier of fact "may take note of any inconsistencies and resolve them accordingly, 'believing all, part, or none of a witness's testimony.'" *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 33, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958.

{¶ 33} Having reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of witnesses, we are unable to conclude that the juvenile court clearly lost its way in resolving conflicts in evidence in the state's favor.  This is not an exceptional case in which the evidence weighed heavily against the adjudication of delinquency and a new trial is required.  H.H.'s sole assignment of error is without merit.

{¶ 34} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

---

[2] We note the evidence regarding the 1:32 p.m. timestamp was mentioned only in closing argument and, as such, was not evidence. *State v. Price*, 8th Dist. Cuyahoga No. 100981, 2015-Ohio-411, ¶ 46.  However, in this case, the surveillance video was introduced as an exhibit at trial and a review of the video shows a 1:32 p.m. time stamp at the time of the shooting.  In this connection, we note Officer Santana testified that the incident report estimated the shooting to have occurred between 1:20 p.m. and 1:30 p.m., and Detective Horvath testified that the shooting occurred around 1:30 p.m.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY J. BOYLE, J., CONCUR