[Cite as *In re E.W.*, 2025-Ohio-1461.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE E.W. | : | |
| | | No. 114403 |
| A Minor Child | : | |
| | | |
| [Appeal by E.W.] | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 24, 2025

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-24-104143

***Appearances:***

David S. Bartos, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Zachary Lafleur, Assistant Prosecuting
Attorney, *for appellee*.

EMANUELLA D. GROVES, J.:

{¶ 1} Appellant, E.W., a minor child, appeals the juvenile court's dispositional entry adjudicating him delinquent of burglary and criminal damaging or endangering and committing him to the legal custody of the Ohio Department of Youth Services. Upon review, we affirm.

## I. Facts and Procedural History

{¶ 2} On April 29, 2024, the Cuyahoga County Prosecutor's Office ("the State") filed a seven-count delinquency complaint against E.W. for offenses that occurred days prior and involved codelinquent R.D. Counts 1 and 2 alleged that E.W. was delinquent of aggravated burglary, first-degree felonies, in violation of R.C. 2911.11(A)(1) and (2), respectively. Counts 3 and 4 alleged that E.W. was delinquent of aggravated menacing, first-degree misdemeanors. Counts 5 and 7 alleged E.W. was delinquent of criminal damaging or endangering, second-degree misdemeanors. Count 6 alleged that E.W. was delinquent of burglary, a second-degree felony. Counts 1 through 5 involved conduct that occurred on or about April 26, 2024, while Counts 6 and 7 involved conduct that occurred on or about April 27, 2024. E.W. denied the complaint's allegations.

{¶ 3} The matter proceeded to trial in August 2024. The following evidence was presented by the State. On April 27, 2024, Y.W. called 9-1-1 to report that a boy and a girl had broken into her house, and she believed the girl was R.D. After an audio recording of the 9-1-1 call was played, Y.W. offered testimony about the circumstances surrounding the call.

{¶ 4} Y.W. awoke in an upstairs bedroom around 7:30 a.m., after hearing "booming and my kids . . . screaming." (Tr. 14.) Y.W. immediately went downstairs and observed R.D. running out of the house and E.W., whom she pointed at and identified during her testimony, "standing right there." *Id.* at 15. E.W. was right in front of her, about a foot or two away, and wearing a winter coat and a dark-colored

do-rag. Y.W. picked up a nearby hammer when she saw E.W. because she knew that R.D. "h[ung] out with a lot of dangerous teenagers." *Id.* at 34. Y.W. testified that E.W. looked at her, appeared shocked, and ran out of the front door after R.D. After R.D. and E.W. fled from her home, Y.W. called 9-1-1 and police officers responded quickly, "not even ten minutes" later. *Id.* at 22. Y.W. testified that she observed E.W. again that day, about 15 minutes later, when police officers drove Y.W. around the corner to identify him.

{¶ 5} Y.W. explained that she knew R.D. very well because she was friends with her children. At the time of the incident, Y.W. believed R.D. was dangerous. Y.W. had never seen E.W. "a day in my life until that Saturday morning when he was standing right by the stairs." *Id.* at 16. Y.W. believed that R.D. and E.W. entered the house through a living-room double window after throwing bricks, breaking the glass in one pane, unlocking the unbroken pane, and sliding it open. Y.W. observed a brick on the broken living-room window's ledge, gashes in the drywall, and damage to the front-door window.

{¶ 6} On cross-examination, Y.W. testified that she saw E.W. immediately when she came downstairs and recalled saying something to him. Y.W. stated that this initial observation of E.W. in her living room allowed her to later identify him. After replaying the 9-1-1 call recording, the following exchange occurred:

> DEFENSE COUNSEL: We just heard the exact moment that you got downstairs, right?
>
> Y.W.: Um-hmm.

DEFENSE COUNSEL: Okay. And this is when you first encounter the boy, but you don't tell the operator that you see him?

Y.W.: Right, because I was focusing on [R.D.] because I knew her. I knew her and when I seen him, we was both in shock. Like we just seen each other and I was already off the phone with the people when I seen him. When I hit down at the bottom of the stairs, he was right there with a black do-rag on. We looked at each other and he ran out.

DEFENSE COUNSEL: Yes or no question, okay? We just heard you get downstairs, you testified that that's when you see the boy and you didn't report it to the 9-1-1 operator, correct?

Y.W.: Okay. Yes.

DEFENSE COUNSEL: And the whole purpose for calling 9-1-1 is to report that this person's in your house, correct?

Y.W.: Right.

DEFENSE COUNSEL: We don't hear you confront him at all, right?

Y.W.: Right.

DEFENSE COUNSEL: And I just asked you, did you say anything to him, and you said yes, I said you're gonna go to jail, right?

Y.W.: Right.

DEFENSE COUNSEL: We didn't hear you say that either, correct?

Y.W.: That's correct.

DEFENSE COUNSEL: This guy's in your house and you don't say anything, contrary to what you said today? You didn't actually see him in your house, did you?

Y.W.: I did see him in my house. He had on a coat and a black or blue do-rag. It was a dark do-rag. I did see him in my house.

*Id.* at 29-30. The defense further questioned Y.W. regarding her statement during the 9-1-1 call that she did not know what the male looked like, despite her testimony

that she saw his face.  Finally, the defense cross-examined Y.W. regarding her identification of E.W. via "cold stand,"[1] suggesting that Y.W. was "kind of tipped off that's who [the police] believed was in [her] house."  *Id.* at 31.  Y.W. responded, "Incorrect.  No.  That's who was in my house."  *Id.*

{¶ 7} Testimony was then offered by Cleveland Police Officers Robert Farren ("Officer Farren") and Ethan Burrell ("Officer Burrell"), who responded to Y.W.'s 9-1-1 call at 7:41 a.m.  Upon entering the home, both officers observed broken windows in the living room and front door.  Officer Farren also observed stone bricks that may have been used to break the living-room window.  Officer Farren learned the identity of R.D., whose name was provided to the responding officers.  Officer Farren explained that while they were taking information for Y.W.'s report, officers could hear a voice coming from the east of their location and that the voice was identified as R.D.'s.  The officers investigated the voice and located R.D. approximately one street east of the scene, approximately 100 feet away.  Officer Farren testified that one other individual was with R.D. and ultimately detained.  Officer Burrell, who was also involved in locating R.D., confirmed that a male and female were together when contact was made.  Officer Farren identified E.W. as that individual in open court.

---

[1] In a "cold stand," a victim or witness is shown only one person and asked whether they can identify the perpetrator of a crime in a relatively short time after the crime's occurrence. *State v. Butler*, 2008-Ohio-1924, ¶ 11 (8th Dist.); *State v. Patton*, 2007-Ohio-990, ¶ 17 (8th Dist.).

{¶ 8} Portions of Officer Burrell's body-camera footage were played in conjunction with his testimony. Officer Burrell identified R.D. and E.W. as the two individuals depicted in the footage and identified E.W. in open court. Officer Burrell advised that he conducted the cold stand shown in the footage and confirmed that the individual in the back seat of the police car said, "That's him, that's him," upon seeing the male suspect, who was wearing a do-rag. The footage also shows that on the way to the cold stand, the individual advised prior to seeing E.W. that he was inside her house, he was right in front of her when she came downstairs, she saw his face, he was wearing all black and a coat, and when she saw him she was going to be able to identify him.

{¶ 9} The 9-1-1 call and body-camera footage were admitted into evidence absent objection, and the defense entered an oral motion to dismiss the matter pursuant to Juv.R. 29. The juvenile court granted the motion in part and dismissed Counts 1 through 5, finding that the State did not present any evidence related to those counts. The defense rested and closing arguments were presented.

{¶ 10} Ultimately, the juvenile court adjudicated E.W. delinquent of Count 6, burglary, and Count 7, criminal damaging or endangering. In so ruling, the juvenile court stated:

> I've had an opportunity to take into consideration the evidence presented today. As it relates to Counts 6 and 7, we heard obviously from two police officers. We also heard from the victim herself. I will state for purposes of the record I had an opportunity to fully listen to obviously the full testimony of the victim as well as observe the demeanor. I find her to be very credible as it relates to these offenses

and I find that the State of Ohio has met their burden as it relates to Count 6 and Count 7.

*Id.* at 71.

{¶ 11} The matter proceeded to disposition in September 2024. Counts 6 and 7 merged and the State elected to proceed on Count 6. E.W. was committed to the legal custody of the Ohio Department of Youth Services for institutionalization in a secure facility for "an indefinite term consisting of a minimum period of one (1) year and a maximum period not to exceed the child's attainment of the age of twenty-one (21) . . . ." (Journal Entry, Sept. 4, 2024.)

{¶ 12} E.W. appeals, raising three assignments of error for review.

### Assignment of Error No. 1

The trial court erred and abused its discretion when determining the testimony of the victim Y.W. was credible.

### Assignment of Error No. 2

The court erred by finding [E.W.] delinquent of Count 6, burglary, when it is against the manifest weight of the evidence.

### Assignment of Error No. 3

The court erred by finding [E.W.] delinquent of Count [7], criminal damaging, when it was against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 13} As an initial matter, we note that each of E.W.'s assignments of error contemplate the manifest weight of the evidence.

{¶ 14} "'A juvenile court may adjudicate a juvenile to be a delinquent child when the evidence demonstrates, beyond a reasonable doubt, that the child

committed an act that would constitute a crime if committed by an adult.'" *In re H.H.*, 2023-Ohio-1292, ¶ 21 (8th Dist.), quoting *In re C.A.*, 2015-Ohio-4768, ¶ 47 (8th Dist.), citing R.C. 2151.35(A) and Juv.R. 29(E)(4). When reviewing challenges to the manifest weight of the evidence in delinquency adjudications, appellate courts employ the same standard of review that applies to criminal convictions. *Id.*, citing *In re Q.W.*, 2017-Ohio-8311, ¶ 7 (8th Dist.), and *In re L.F.*, 2012-Ohio-302, ¶ 6 (9th Dist.) (explaining that while juvenile delinquency cases are technically civil in nature, the sufficiency and manifest-weight standards of review from adult criminal appeals are applied due to the inherently criminal aspects of delinquency proceedings).

{¶ 15} In order to evaluate whether a judgment or verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the trier of fact clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Jordan*, 2023-Ohio-3800, ¶ 17, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), and *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983); *In re H.H.* at ¶ 27 (applying the same manifest-weight standard of review in an appeal from a delinquency adjudication); *see also In re Q.W.* at ¶ 14, and *In re D.W.*, 2014-Ohio-5038, ¶ 9 (8th Dist.). The Ohio Supreme Court has repeatedly held that "[a] manifest-weight challenge should be sustained "'only in the exceptional case in which the evidence weighs heavily

against the conviction.'"" *State v. Nicholson*, 2024-Ohio-604, ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175; *State v. Hundley*, 2020-Ohio-3775, ¶ 80.

{¶ 16} With this standard of review in mind, we address E.W.'s three assignments of error.

### A. Witness Credibility

{¶ 17} In his first assignment of error, E.W. argues that the juvenile court erred in finding that Y.W. was a credible witness. E.W. claims that "Y.W.['s] credibility is thwarted by the inconsistencies in her testimony" and that Y.W. "was hostile when confronted with the 9-1-1 recording discrepancies."

{¶ 18} Although witness credibility is one factor that appellate courts consider when reviewing a manifest-weight challenge, "[d]eterminations regarding the credibility of witnesses and the weight given to the evidence are primarily matters for the trier of fact." *In re H.H.*, 2023-Ohio-1292 at ¶ 23, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). Indeed, "[t]he factfinder, 'is in the best position to take into account inconsistencies, along with the witness's manner, demeanor, gestures, and voice inflections, in determining whether the proffered testimony is credible.'" *State v. Winston*, 2024-Ohio-4583, ¶ 39 (8th Dist.), quoting *State v. Holloway,* 2015-Ohio-1015, ¶ 42 (8th Dist.).

{¶ 19} After making these critical observations, the trier of fact is free to accept or reject any or all of the testimony of any witness. *State v. Bey*, 2025-Ohio-740 ¶ 55 (8th Dist.), citing *State v. Parke*, 2023-Ohio-1144, ¶ 16-17 (8th Dist.). This court has repeatedly held that a defendant is not entitled to reversal on manifest-

weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory. *State v. Bates*, 2024-Ohio-2909, ¶ 33 (8th Dist.); *Parke* at ¶ 15; *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.); *State v. Nitsche*, 2016-Ohio-3170, ¶ 45 (8th Dist.); *State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.) ("A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.").

{¶ 20} After reviewing the record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we are unable to conclude that the juvenile court clearly lost its way in resolving conflicts in evidence in the State's favor. Despite an imperfect accounting regarding what was and was not said during her 9-1-1 call, Y.W. consistently stated that a boy and girl broke into her home and repeatedly identified them as R.D. and E.W. Throughout her testimony, Y.W. recalled that she heard a boom and her children screaming; immediately went downstairs to investigate; saw R.D. running out of the house; and encountered E.W., who was directly in front of her and wearing a winter coat and dark-colored do-rag. Y.W. was steadfast in her testimony that E.W. "was in [her] house," even throughout cross-examination.

{¶ 21} Y.W.'s credibility was bolstered by the body-camera footage and testimony of responding officers, who located R.D. and E.W. together about 15 minutes later and approximately one street east and 100 feet away from Y.W.'s home. E.W. was wearing all black, a dark-colored do-rag, and a coat. Y.W. then identified E.W. as the male perpetrator in a cold stand.

{¶ 22} Finally, we note that the juvenile court, who was in the best position to determine Y.W.'s credibility, advised that it "fully listen[ed] to . . . the full testimony of the victim as well as observe[d] the demeanor" and found Y.W. "to be very credible as it relates to these offenses." Based on the record before us, we cannot say that the juvenile court created a manifest miscarriage of justice or that this is the exceptional case in which the evidence weighed heavily against E.W.'s delinquency adjudication and required a new trial. Accordingly, E.W.'s first assignment of error is overruled.

**B. Criminal Damaging or Endangering**

{¶ 23} For ease of analysis, we address E.W.'s third assignment of error before his second. In his third assignment of error, E.W. argues that the juvenile court erred in adjudicating him delinquent of criminal damaging or endangering in violation of R.C. 2909.06(A)(1). E.W. claims that the evidence fails to establish that he committed any criminal damage to the property. E.W. asserts that his mere presence at the crime scene does not infer guilt or complicity. Making a passing reference to *State v. Ferguson*, 5 Ohio St.3d 160 (1983), E.W. claims that the testimony in support of his guilt or complicity is "unfounded, vague and ambiguous and should not be given weight." Aside from this reference, E.W. fails to cite any authority to directly support his argument.

{¶ 24} R.C. 2909.06(A)(1) provides that "[n]o person shall [knowingly] cause or create a substantial risk of physical harm to any property of another[, by any means,] without the other person's consent." Because circumstantial and direct

evidence have the same probative value, a defendant may be convicted of criminal damaging solely based on circumstantial evidence. *State v. Todd*, 2023-Ohio-2139, ¶ 14 (1st Dist.). The Ohio Supreme Court explained:

> A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence. Consideration of circumstantial evidence as a mitigating factor would inevitably lead to undercutting the underlying conviction itself by implying that a conviction based on circumstantial evidence is inherently less reliable than a conviction based on direct evidence.
>
> In fact, a conviction based upon purely circumstantial evidence may be just as reliable as a conviction based on direct evidence, if not more so.

*State v. Apanovitch*, 33 Ohio St.3d 19, 27 (1987).

{¶ 25} In this case, the State presented direct evidence of physical harm to Y.W.'s home and circumstantial evidence that E.W. was one of the offenders. The evidence established that Y.W. heard a boom and her children screaming, immediately went downstairs, and saw R.D. and E.W. in her home. Y.W. and both responding officers observed broken windows in the living room and front door. Y.W. also testified that the home's drywall was damaged. Y.W. believed R.D. and E.W. entered the house through the living-room window after breaking the glass with a brick, which she saw on the window's ledge. Upon entering the home, Officer Farren observed the stone bricks that may have been used. About 15 minutes later, R.D. and E.W., who matched Y.W.'s suspect descriptions, were located by responding officers approximately one street east and 100 feet away. A cold stand was subsequently conducted, and Y.W. identified E.W. as the male perpetrator.

{¶ 26} Upon weighing this evidence and the reasonable inferences drawn therefrom, we cannot say that the juvenile court clearly lost its way and created a manifest miscarriage of justice or that this is an exceptional case. Based on the record before us, the juvenile court could properly conclude beyond a reasonable doubt that E.W. committed criminal damaging or endangering in violation of R.C. 2909.06(A)(1). *See, e.g.*, *Cleveland v. Battles*, 2018-Ohio-267 (8th Dist.) (finding that a criminal damaging conviction was not against the manifest weight of the evidence where there was direct evidence of criminal damaging and circumstantial evidence that the defendant was the offender). Accordingly, we decline to find that the juvenile court's delinquency adjudication of E.W. for criminal damaging or endangering was against the manifest weight of the evidence and overrule his third assignment of error.

### C. Burglary

{¶ 27} In his second assignment of error, E.W. argues that the juvenile court erred in adjudicating him delinquent of burglary in violation of R.C. 2911.12(A)(1). E.W. argues that the evidence fails to establish that he was not invited into Y.W.'s home and trespassed. E.W. further claims that his mere presence in the home is not evidence that he acted with criminal purpose or inflicted any damage. Other than referencing *Ferguson*, 5 Ohio St.3d 160, for the proposition that inferences should not be drawn from vague and ambiguous testimony, E.W. fails to cite any caselaw in direct support of his argument.

{¶ 28} R.C. 2911.12(A)(1) provides in pertinent part:

> No person, by force, stealth, or deception, shall . . . [t]respass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense[.]

Relevant to this appeal, the element of "trespass" is satisfied when a person, without the privilege to do so, knowingly enters or remains on the land or premises of another. R.C. 2911.10; R.C. 2911.21(A)(1). The intent element — with purpose to commit any criminal offense — must be inferred from the surrounding facts and circumstances since it exists in a person's mind and cannot, if ever, be demonstrated by direct testimony. *State v. Plachko*, 2009-Ohio-1987, ¶ 14 (8th Dist.). "In particular, 'it is difficult to ascertain the intent of a person in forcibly entering an occupied structure if he is apprehended [or interrupted] before he commits any overt act inside the premises.'" *State v. Ortiz*, 2016-Ohio-974, ¶ 23 (6th Dist.), quoting *State v. Flowers*, 16 Ohio App.3d 313, 315 (10th Dist. 1984), *overruled on other grounds by State v. Fontes*, 87 Ohio St.3d 527 (2000). However, "'[p]ersons do not ordinarily forcibly enter a dwelling being occupied by others unless there is an intent to commit a crime, the most likely crime being a theft offense in the absence of circumstances giving rise to a reasonable inference of some other offense being the purpose of entry.'" *State v. Dailey*, 2007-Ohio-6650, ¶ 17 (8th Dist.), quoting *Flowers* at 315.

{¶ 29} Based on our review of the record, we cannot say that the juvenile court clearly lost its way and created a manifest miscarriage of justice. Nor is this the exceptional case contemplated by the Ohio Supreme Court. The State presented

evidence that Y.W. woke up to a booming noise and her children screaming. Y.W. immediately went downstairs and saw R.D. running out of the house and E.W. standing right in front of her. At the time of the incident, Y.W. believed R.D. was dangerous and did not know E.W. Based on a broken living-room window and a brick lying on the window frame, Y.W. believed R.D. and E.W. entered the home after breaking the glass in one pane, unlocking a second unbroken pane, and sliding it open. Responding officers corroborated Y.W.'s testimony regarding the broken windows and bricks and located R.D. and E.W. together, nearby, and shortly after the crime.

{¶ 30} Contrary to E.W.'s contentions on appeal, nothing in the record suggests that E.W. was invited into Y.W.'s home. Nor does the record reflect that E.W. entered Y.W.'s residence with any purpose other than to commit a criminal offense. Rather, as established above, the record reflects that E.W. committed the offense of criminal damaging or endangering in the process of forcibly entering Y.W.'s home. Based on the surrounding facts and circumstances, a reasonable inference can be drawn that additional criminal offenses would have occurred had Y.W. not interrupted before any further overt actions were taken inside the premises. Thus, the juvenile court could properly conclude beyond a reasonable doubt that E.W. committed burglary in violation of R.C. 2911.12(A)(1). Accordingly, we decline to find that the juvenile court's delinquency adjudication of E.W. for burglary was against the manifest weight of the evidence and overrule his second assignment of error.

**{¶ 31}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

LISA B. FORBES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR